And the court will proceed to the fifth case, Simpson v. St. James Hospital. Ms. Cunningham. May it please the court, Jamel Cunningham for Appellant Arlene Simpson. Your Honors, I'd like to start letting you know what the focus of Appellant's brief is. So the district court ruled that plaintiff had met her prima facie case for employment discrimination on the basis of her race and on the basis of her age. The district court, however, found that the plaintiff did not, the evidence did not show that plaintiff refuted defendant's pro-offered reason for her termination. I'd like to start off by pointing out that one of the exact same elements of the prima facie case that similarly situated individuals were treated better than plaintiff was found by the district court. I believe on pages seven through eight of the judge's opinion, it actually says that there's evidence that the defendant applied its rule disparately towards plaintiff. With that said, pretext may also be shown by that exact same element, that similarly situated individuals outside of plaintiff's protected class were treated better than plaintiff. And so plaintiff's argument in essence is if the district court found that that element was present in her prima facie case, those same facts should also be applied to the pretext argument. Defendant's pro-offered reason for terminating plaintiff is based on five events, I call them five strikes, that culminate in the reason for her termination. And very briefly, I'll take each one of those individually. There was a corrective action issued on November the 19th, 2010. Plaintiff was a registered nurse who had worked for a defendant for some time. The alleged discriminator, Maureen Kelly, plaintiff's argument is that she had no performance issues. There were no performance deficiencies throughout her entire career until Kelly became her manager. On November the 19th, 2010, plaintiff was issued a corrective action for an alleged patient complaint. Now, plaintiff's first problem with this is that there are no documents or there's no evidence of this complaint other than Kelly saying a patient complained. In her motion for summary judgment or response to defendant's motion for summary judgment, plaintiff included an affidavit from another nurse, Felicia Carter, who was present in the room at the time the patient allegedly had this problem with plaintiff. Kelly even says that the patient wanted plaintiff removed and Kelly replaced plaintiff, touting Kelly for her professionalism and her skills. I'm sorry, touting Carter. Carter's affidavit sets forth that she cared for the patient, she was there, and that there was no problem. And I think that evidence right there is enough to refute defendant's pro-offered reason for this particular corrective action, that plaintiff was rude or unprofessional, that the patient had a problem, when Carter, who was right there, says that there was no problem. Further, I think what shows evidence of pretext is the fact that Kelly says that the patient was unhappy, and that was the reason for the disciplinary action. However, there's a different reason that's documented for the plaintiff's disciplinary action. And I think the contradiction is one reason says the plaintiff was unhappy, another reason says you failed to discuss with the patient what you were doing as you were going along. So I guess I want to know about the four reprimands that occurred in 2010 and 2011, one related to the surgical dressing and pain medication, the issue of the patient care technician to take her place, some of those. I mean, I know you started with the November. There were three complaints in a single month in July. So maybe you could speak to that. Yes, Judge. The second corrective action on October 14, 2010, was for the plaintiff's alleged failure to change a dressing and a PCA pump. The plaintiff's evidence shows that the nurses were trained to do exactly what she did. Therefore, what she did was not a violation. Further, I think what shows pretext is that the support for the alleged failure to change the dressing and PCA pump, the documentation is also inconsistent. The notes that allegedly support this violation are dated August 3, 2010. The corrective action claims that the alleged incident happened on 10-14, 2010. The document supporting the alleged violation references suctioning, and the affidavits that the nurses provided, plaintiff, and I believe also Carter provided, say that a PCA pump has nothing to do with suctioning. So, again, this belief can't be sincere, and the position is that these things are made up. Regarding the January 14, 2011 corrective action, the allegation is that plaintiff ordered a patient care technician to assist with their procedure. Now, of course, plaintiff denies that and says that it was made up, and that, again, there's no evidence that any of this stuff happened other than Kelly saying it happened. And to address the July 28, 2011 corrective action, the three separate violations, first of all, Kelly testified that there's a policy and a practice of hers to notify individuals right away if there's any problem with their work or with their service so that it can be corrected. But she didn't do this with plaintiff. So these three alleged violations just piled up, and she never said anything about it until issuing this corrective action on 7-28-11. One of those incidents involved plaintiff being rude to a patient. There's another nurse who's not African American and who's under 40 who was also named in that same complaint. However, she was not disciplined. The defendant tries to distinguish and say, well, plaintiff went back into the room, and plaintiff allegedly did more, but there's no evidence of that. The only thing that's there is an e-mail that names plaintiff and this other nurse, Ms. Galderia, of being involved in this incident with the patient, but only plaintiff was disciplined. And I think the defendant's failure to follow its own rules and policies is evidence of pretext, and I think that goes through the four straws, and this last incident was the alleged final straw. And I also think it's important to note that because there's evidence of pretext of these four, this last incident could not have been the final straw. If anything, it may have been the first straw, which would not amount in a culmination of events and unchanged behavior that would warrant plaintiff's termination. So this alleged final straw is that there was a complaint by a physician. And, again, plaintiff's position is that even if this were a genuine complaint, even if it was genuinely believed by Kelly, there are still so many other similarly situated employees who were not disciplined based on a single complaint. There's Erica Martin. There's evidence that a patient complained. Her entire team complained about her, and she was simply reassigned. She was not disciplined. Defendant argues that Ms. Martin was disciplined seven times, issued seven corrective actions before she resigned. That's different from how plaintiff was treated in and of itself. Plaintiff allegedly was issued five corrective actions and was terminated. And here you have Erica Martin who was issued seven corrective actions, and she wasn't terminated. She resigned. And, again, the other similarly situated individuals who are Vanessa Mendez, again, defendant argues that there are numerous violations and that they were disciplined after numerous violations. But, again, these corrective actions, there's evidence of pretext for these corrective actions. And if, and I'm not conceding, but if number five is genuine, that's one, compared to the numerous that the other individuals were issued and were not terminated. May I save a little time for rebuttal? Yes, I'm sorry, Judge. Thank you. Thank you, Ms. Cunningham. Mr. Dignam. May it please the Court, Robert Dignam for St. James Hospital. I want to point out at the outset, in response to what Ms. Cunningham just said, she continues to argue despite the facts in the record, instead of arguing the facts in the record. At page 10 of this brief, of this district court's order granting summary judgment, in response to the plaintiff's allegation that she was never told about the problems that she was creating for the hospital based upon her patient care, the Court said, as the defendant correctly points out, the undisputed evidence shows that plaintiff was actually notified right after each incident. The hospital followed its rules. The hospital's rules are based on what are known as the Franciscan values. To comply with these values, Arlene Simpson was expected to, among other things, use tact, sensitivity, sound judgment, a professional attitude when relating to patients and family members, and also show respect, empathy, and consideration to those individuals. Simpson failed to follow the Franciscan values, and that is the reason that she was discharged. She is asking this Court now to sit as a super personnel department, which this Court has repeatedly declined to do. What Simpson does is say that her manager, Maureen Kelly, alleged that she did a bunch of things inconsistent with the Franciscan values or her duties as a nurse. That is incorrect. Each and every complaint about Simpson that led up to her discharge was an independent complaint by either a patient, a family member of a patient, or an independent doctor. Maureen Kelly, as her manager, naturally had to deal with all of these complaints, but she did not initiate a single one. Simpson acknowledged in her deposition that the hospital has a duty to respond to these independent complaints and a duty to take corrective action when warranted. Yet when the hospital finally acted based upon all the complaints against Simpson that added up, she then claimed it was discrimination based on either her gender, her disability status based on pregnancy, or her age, or her race. She admits that these family members and patients made complaints about her and that doctors made complaints about her regarding her work performance and her behavior. She does quibble with some of the facts, just like she quibbles with the fact about whether she was notified timely, which she was. She said things like, how does the family member know I was rude to the patient if the family member was not in the hospital to say I was rude to the patient? Well, she discounts the possibility that the patient told their family member, who subsequently reported the problem, to the hospital. These are the instances of unacceptable behavior. She was dismissive and rude to a terminal patient who tried to reach out to her in a hospital room and told her she was too busy to talk to her. She re-entered a patient's room to argue with the patient who had reported that her perfume was making her sick, to tell the patient, I'm not wearing perfume, but thanks a lot, now I'm going to need, now I'll have to take the next patient. This is her not living up to the Franciscan values. She re-entered a patient's room to argue with the fiance of a patient because he had reported a problem with the quality of her nursing care. And finally, as alluded to by Ms. Cunningham, she entered a patient's room the day after a patient had her knee replaced, upset with the patient for asking for ice, and unplugged her IV morphine. That retaliatory act is what earned her discharge, not discrimination. Simpson produced no direct evidence of discrimination. She has not one scintilla of evidence that anybody had a problem with her membership in any of those protected classes, so she turned to the indirect method. The district court understood that she never produced any indication that a male or expressly non-disabled employee allegedly suffered any better or had any better treatment, and so a prima facie case was not proved as to those counts. The court did accept that, or at least believe that Simpson had stated a prima facie case as to the age and race claim based upon her putting out alleged other employees who supposedly were treated better. And that is the only instance in which the hospital respectfully disagrees with the decision. We do not believe that the evidence was adequate to even have stated a prima facie case on the age or race count, and here's why. Simpson named four comparators. She named Galdario. They both were rude to a patient, but only Simpson went back in to argue with the fiancé for complaining about her. She named a person who supposedly was, who was in fact tardy all the time, but said she never got fired. She did get fired. She named Nurse Mendez, who she said performed poor patient care. There was a lawsuit arising out of that matter. Nurse Mendez was found to have done nothing wrong. The case was voluntarily dismissed. There was no reason for a sanction. And as to Nurse Martin, all that Simpson could muster was on a particular day she had a team of patients taken away from her but didn't experience a sanction. The hospital had no name of a patient, no date, no alleged conduct. How could that be a comparator when there was no evidence in the record? But ultimately, the hospital is entirely satisfied with the district court's conclusion that even if Simpson had stated a prima facie case as to age and race discrimination, there was certainly a legitimate and nondiscriminatory reason for the discharge decision. And the law says that even if the hospital happened to be mistaken and that Simpson unfortunately had a series of inaccurate and hypersensitive patients or family members complaining about her, the hospital was still entitled to summary judgment, even if mistaken, because there would have to be some evidence of a discriminatory animus, and that is completely absent in this case. Therefore, to be clear, the hospital does not believe it was mistaken in any way. Arlene Simpson horribly failed to live up to the Franciscan values on repeated occasions, culminating with her decision to stop the IV pain medication of a surgical patient on her own doing, and for that reason she was terminated. There is no discrimination proved in this case. The district court's order granting summary judgment was entirely appropriate, and we would ask that that order be affirmed in all respects. Thank you, Mr. Dignam. Thank you. Ms. Cunningham. Thank you. Really quickly, Your Honors, I think it's important to note that Kelly had the discretion to determine what violated the Franciscan values. I disagree with counsel's presentation of plaintiff's position. I don't think that she's admitting that she engaged in any of the conduct that defendant has argued. And again, I think this argument, the brief is focused on the pretext issue, whether or not there's evidence of pretext. And I think the fact that the inconsistencies in the alleged corrective actions, its failure to follow its own rules and policies, the fact that Valderra was treated differently than plaintiff, and even the other similarly situated individuals, Mendez, defendant. So let me ask you this. Does she get notice of all of those complaints, as counsel said? Judge, I don't think so. I mean, even with the 728.11, there were three different incidents that her testimony is very clear. She didn't know about any of them until she got the corrective action of 728. So presenting her with a corrective action is not giving her notice when the alleged actions happened prior to. So you're denying that there was any paperwork generated that notified her of the complaint prior to that? Absolutely. Yes, Judge, absolutely. There was no paperwork. There was nothing generated prior to being presented with these corrective actions. And in conclusion, I think these similarly situated individuals need to be looked at more specifically because they do have multiple infractions, whereas plaintiff may have one. Thank you. Thank you, Ms. Cunningham. Thank you, Mr. Dignan. The case is taken under advisement.